IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02554-MEH

RAEANN M. SANDOVAL,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff Raeann Michelle Sandoval appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds argument would not materially assist in its determination of this appeal. After consideration of the parties' briefs and the administrative record ("AR"), the Court affirms the Administrative Law Judge's ("ALJ") decision.

## BACKGROUND

### I.     Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB filed on October 30, 2009. AR 65. Her application was denied on June 30, 2010. AR 63-

64. Plaintiff requested a hearing before an ALJ on August 5, 2010. AR 91. ALJ James Wendland held the hearing on September 9, 2011. AR 114. Plaintiff was represented by counsel at the hearing, and Plaintiff and a vocational expert ("VE") testified. AR 31-62. ALJ Wendland issued a written ruling on September 21, 2011, finding Plaintiff was not disabled starting on the alleged onset date of October 30, 2008. AR 15-31. On September 13, 2012, the SSA Appeals Council ("AC") denied Plaintiff's administrative request for review of ALJ Wendland's determination, making the SSA Commissioner's denial final for the purpose of judicial review. AR 1-5. *See* 20 C.F.R. § 404.981. Plaintiff filed a complaint in the United States District Court for the District of Colorado seeking review of the Commissioner's final decision. On March 17, 2014, the Honorable R. Brooke Jackson issued an order reversing the decision of the Commissioner and remanding the case for further proceedings ("Order"). AR 621-638.

Plaintiff raised three issues on appeal, and Judge Jackson addressed all of them in his Order. AR 630. However, only one issue constituted reversible error. Judge Jackson held that ALJ Wendland committed reversible error at Step Four when he did not consider Plaintiff's non-severe impairments in forming his Residual Functional Capacity ("RFC"). AR 631. That is, ALJ Wendland stated in his decision that at Step Two Plaintiff's conditions (sleep apnea, diabetes, and hypertension) were found to be non-severe; therefore, at Step Four ALJ Wendland found the non-severe impairments had already been addressed and did not consider them in his RFC. *Id.* Judge Jackson held this was reversible error because the Tenth Circuit and 20 C.F.R. § 404.1545(e) clearly required the ALJ to address *all* of Plaintiff's impairments, both severe and non-severe, at Step Four. AR 632. Judge Jackson held the Court could not determine whether

the error was harmless, because it was possible the cumulative effects of all of Plaintiff's impairments could have led to additional restrictions in the RFC.  AR 632.  Judge Jackson admitted it was possible the error had no effect on ALJ Wendland's analysis, but since it was uncertain, the error could not be considered harmless and the case must be remanded.  *Id.*

Following remand, a hearing was held before ALJ Jon L. Lawritson on July 8, 2014.  AR 518-568.  ALJ Lawritson issued an unfavorable decision on August 27, 2014.  AR 678-697.  Plaintiff requested and was granted review from the AC, AR 706-707, which remanded the case to the ALJ with directions to "consolidate the current claim and the subsequent application … and create a complete and final exhibit list," "[g]ive further consideration to the nontreating source opinion … and explain the weight given to such opinion evidence," and issue a new decision.  AR 708-710.

The case was again before ALJ Lawritson, who conducted a hearing on June 14, 2016.  AR 569-598.  ALJ Lawritson, after addressing the concerns of the AC, once again issued an unfavorable decision on November 1, 2016.  AR 479-508.  On September 5, 2018, the AC declined to review ALJ Lawritson's decision, making the SSA Commissioner's denial final for the purpose of judicial review.  AR 470-472. *See* 20 C.F.R. § 404.981.  Plaintiff filed this civil action, and the SSA Commissioner's decision is now before the Court for review.

## II.    Plaintiff's Alleged Conditions

Because this case previously has been before Judge Jackson, a complete summary of Plaintiff's alleged conditions as of ALJ Wendland's September 21, 2011 decision exists. Plaintiff states in her opening brief that she will "refer the court to [the prior] summary."  Opening Br.,

ECF 18 at 8.  Additionally, Defendant cites Judge Jackson's rulings as support for her responses to Plaintiff's allegations.  *See* Response Br., ECF 19.  In relying on Judge Jackson's prior rulings Defendant impliedly adopts the judge's statement of facts.  Thus, as neither the Plaintiff nor the Defendant object to Judge Jackson's thorough and cogent factual summary, this Court will adopt it from his March 17, 2014 Order.  AR 622-630.

While both parties and this Court incorporate Judge Jackson's summary of the previous record, there have been additions to the record that must be summarized to adequately present the current complete record.

Mental Impairments

Plaintiff supplemented the record with additional exhibits describing her treatment at Jefferson Center for Mental Health ("JCMH").  AR 1480-1531.  The additional exhibits show Plaintiff was enrolled in therapy with Erin Haley MA, LPC, at JCMH from August 31, 2010, through August 8, 2011.  AR 1502.  Plaintiff's diagnoses of major depressive disorder, recurrent, moderate; generalized anxiety disorder; and posttraumatic stress disorder remain consistent with the previous record. Plaintiff was ultimately discharged from treatment due to her frequent cancellation of appointments and the fact she was not "making progress" and did not "appear to be involved in therapy."  AR 1505.  The Court finds the additional exhibits do little to support a conclusion different than Judge Jackson's regarding Ms. Haley's treatment of Plaintiff.  Most of the added exhibits document short interactions between Plaintiff and staff at JCMH discussing assistance with benefits, housing, and public transportation services.  AR 1482-1494, 1497-1499.

On October 19, 2011, Plaintiff moved to Adams County and, on referral from JCMH,

visited Community Reach Center ("CRC") to continue her mental health treatment. AR 1532. Plaintiff indicated during her initial diagnostic interview on January 24, 2012, that she suffered from anxiety, depression, and panic disorders. AR 1551, 1533. The initial diagnostic interview indicated Plaintiff suffered from anxiety, PTSD, and a probable mood disorder. *Id.* Over the course of the next seven months Plaintiff demonstrated steady improvement. Objectively, Plaintiff was attending therapy with Joan Fitzgerald, LPC, arriving early, and appearing pleasant and cooperative. AR 1556, 1558. Subjectively, Plaintiff reported she still had difficulty going places alone, trouble sleeping after she became unable to pay for her Ambien prescription, and experienced intrusive thoughts; also, she was guarded, suffered "hyperarousability," and occasionally felt irritated and angry. *Id.* However, Plaintiff also reported her medication "appeared to be working," she felt "less depressed and not anxious overall," she was able to "babysit at a house three minutes from where the Aurora theater" shooting took place, she sometimes had a "great day," and she had overall "significant ongoing improvement." *Id.* On October 30, 2013, Plaintiff reported feeling anxious about getting her own apartment but her coping skills, such as reading her Bible and going to church, had helped reduce her anxiety. AR 1307. Plaintiff was terminated from treatment on November 6, 2013 for consistently failing to schedule or attend appointments. AR 1316.

Plaintiff returned to therapy on February 7, 2014. AR 1306. During this session Plaintiff reported she was in a new relationship that "seem[ed] to 'be too good to be true which [was] bringing up a lot of [her] PTSD and anger towards men.'" *Id.* She also admitted that "while seeing Joan [Fitzgerald] and tak[ing] meds consistently she was doing very well and report[ed]

'that since I haven't been here and on my meds the sxs[1] are sneaking back in.'" *Id.* Plaintiff's attendance again became irregular, and she was discharged from services for failure to attend on February 10, 2015. AR 1314. The discharge summary indicated Plaintiff was making "moderate progress" and reported she was "doing better." *Id.* When she was last seen she reported she had lost her housing and was searching for a new place to live. *Id.*

Plaintiff reestablished care at CRC on April 23, 2015. AR 1348. Plaintiff reported a return of almost all symptoms, saying she had been "moody, irritable, and, anxious lately." *Id.* On September 30, 2015, Plaintiff appeared anxious and reported her husband, who was recently released from prison, was visiting her often. AR 1330. Plaintiff stated "the marriage was over before he went to prison," and she felt she had the strength to "follow through" and file the divorce papers, saying she had friends for "help and support." *Id.* During her October 15, 2015 visit, Plaintiff reported feeling more anxious than usual due to the fact she was attacked by a woman who was apparently intoxicated. AR 1329. Plaintiff stated the session was helpful, and she had friends who were supportive. *Id.* Plaintiff's final medical record shows she was seen via "tele-video" for a medication follow up on October 23, 2015. AR 1326. She reported she felt "anger about the incident," but she had been using "learned and appropriate coping skills" and was "doing good now." *Id.* Plaintiff was again discharged on November 30, 2015 for failing to attend services. AR 1310.

Physical Impairments

The updated record of Plaintiff's physical impairments shows Plaintiff had continuing

---

[1] It is the Court's understanding that "sxs" is short hand for "symptoms."

treatment at Metro Community Provider Network ("MCPN"). AR 1370-1479. These records date from August 8, 2010 through August 28, 2013. AR 1370-1497, 1598. A significant number of the documents are duplicates from the original record, but Plaintiff's submission does contain some new medical reports. The record indicates Plaintiff first visited MCPN for a diabetes management check on June 5, 2009. AR 1448. Plaintiff continued to have regular diabetes management checks throughout the next few years with few irregularities. AR 1443, 1431, 1426, 1422, 1407, 1393. One such irregularity was on April 24, 2010, when Plaintiff visited MCPN due to sores that had developed on her body. AR 1438. This condition was resolved, and there is no mention of it again in the record.

Plaintiff alleges she has had back pain since 2008. AR 1374. However, her first medically documented complaint of back pain is on July 21, 2011, when Plaintiff claimed she had been diagnosed with sciatica "years ago" and experienced "acute exacerbation over the past 1 1/2 years." AR 1380, 1389. Erin Frazier, PA inspected Plaintiff's back and found "no deformity, mass swelling, or inflammation, and minimal tenderness was found in the left paraspinal muscles, lower back, and sciatic notch." AR 1390. Furthermore, Ms. Frazier noted Plaintiff had full range of motion and normal strength. *Id.* During Plaintiff's final documented visit specifically for back pain, she claimed her pain was a ten on a scale of one to ten, with ten being the worst pain possible. AR 1374. Plaintiff claimed Flexeril "made her back better," and sitting, walking, or standing for long periods "made her back worse." *Id.* On August 5, 2013, Plaintiff visited MCPN with complaints of right neck and shoulder pain. AR 1598. During her follow-up visit on August 28, 2013, Plaintiff claimed she was still experiencing right neck and

shoulder pain but Flexeril "really helped." AR 1592.

The most recent medical reports in the record indicate Plaintiff visited Salud Family Health Centers to establish care on July 17, 2015. AR 1319. Plaintiff reported her pain was a five to six on the pain scale, which the Court assumes to be a scale of one to ten. *Id.* However, the report does not indicate where Plaintiff was experiencing the pain. AR 1319. Additionally, just four days later, on July 21, 2015, she claimed her pain was zero on the pain scale. *Id.*

## III.    Hearing Testimony

Plaintiff has had three separate hearings before an ALJ. The first hearing was held September 9, 2011. AR 760-791. The Court will not summarize this hearing as the testimony was already considered in Judge Jackson's previous Order. However, there have since been two additional hearings on July 8, 2014, and June 14, 2016. AR 518-568, 569-598. The 2014 hearing was held after Judge Jackson's Order, and the 2016 hearing was held after the case was remanded by the AC.

### July 8, 2014 Hearing

At the hearing on July 8, 2014, Plaintiff appeared with counsel, and she and a VE, Martin Rauer, testified. AR 518. Plaintiff testified her condition had worsened since the 2011 hearing, specifying that "the mental part" had become worse. AR 522. She stated that the frequency and intensity of her mental impairments had become greater. *Id.* Plaintiff represented she was approved for Section Eight housing approximately eight months previously and she now lived alone which was "different." *Id.* She related that she had recently had a panic attack and she felt "like [her] heartbeat got scared" and she "was going to be hurt." *Id.* She stated that her attacks

lasted about ten minutes and that they were often. AR 524. Plaintiff testified she used her coping skills that she learned from Joan Fitzgerald, but they did not always seem to work. *Id.* She claimed she still locked her bedroom door even when she was alone, because she did not feel safe due to her traumatic past. *Id.*

Plaintiff testified her diabetes was under control, and she had lost weight and was currently three hundred pounds. AR 525. She also stated she still had not been able to acquire a CPAP machine due to her financial situation. *Id.* Additionally, Plaintiff indicated she was still having back pain daily. AR 526. She stated she had pain if she sat or stood for long periods of time. *Id.* Plaintiff took Flexeril and Meloxicam, and she tried to exercise. *Id.* Furthermore, Plaintiff testified that after twenty minutes of sitting she needed to stand and stretch, and the time varied until she was able to sit again. AR 527. Plaintiff then related that she was not able to stand all day. *Id.* Plaintiff alleged her pain had been so severe that she could only sit twenty minutes and stand ten minutes at a time since early 2000. AR 528. ALJ Lawritson asked Plaintiff if her previous employer allowed her to alternate sitting and standing since she worked until 2008. AR 529. Plaintiff replied that her employer "didn't like it" but they allowed her to sit and stand whenever she needed. *Id.* After further inquiry by ALJ Lawritson, Plaintiff stated she did not ask her employer for permission to alternate sitting and standing but "just did it" and no one ever confronted her. AR 530.

Plaintiff testified she had difficulty getting along with people and that she "blows up." *Id.* She explained that if somebody "tells her what to do" she "gets upset" and would yell or raise her voice. AR 531. Plaintiff stated her "episodes" were not confined to the work environment but

happened in her personal life as well.  AR 531.

ALJ Lawritson then allowed Plaintiff's counsel an opportunity to examine Plaintiff.  AR 532.  Plaintiff testified that she had more difficulty interacting with men than women due to her history of abuse and sexual assault.  *Id.*  Plaintiff also testified that she had difficulty going to unfamiliar places.  AR 534.  Plaintiff clarified a previous question by ALJ Lawritson, testifying that she was the manager of an office and the owner was not in the office often; therefore, she was able to sit and stand as necessary.  *Id.*  ALJ Lawritson interjected and inquired about the responsibilities of Plaintiff's role as manager. Plaintiff testified she oversaw two other employees, rated their performance, and made sure they were doing their work and meeting their quotas, but did not set their schedules and did not have the power to hire or fire employees.  AR 536.

Plaintiff then testified she lied down often throughout the day.  AR 538, 539.  Plaintiff originally testified she began lying down eight hours a day in 2000.  AR 540.  When ALJ Lawritson expressed confusion and inquired how it was possible she began lying down for eight hours a day in 2000, Plaintiff clarified she had lain on the floor a combined eight hours a day since 2011.  AR 542-544.  ALJ Lawritson then asked Plaintiff if she had been lying on the ground eight hours a day in 2011, why she had not mentioned it at the 2011 hearing.  *Id.*  Plaintiff replied that it was because she did not remember the question ever "coming up."  AR 545.

Plaintiff further testified that she had three panic attacks in the last thirty days and that three to five attacks per month was typical.  AR 546.  Plaintiff stated that she had difficulty sleeping at night due to "racing thoughts," and Ambien or Trazodone helped her sleep.  AR 549.  She said she had a "down day … [p]retty often."  AR 549-550.  She described a "down day" as

"depressed, racing thoughts, worried." *Id.* Plaintiff testified that this occurred five out of seven days a week, and during those days she did not leave her home. AR 550. ALJ Lawritson asked Plaintiff why she did not testify to this limitation at the hearing in 2011. AR 551. Plaintiff claimed the ALJ "didn't ask me as much there. And he asked me more about my back…" *Id.* Plaintiff's counsel then objected that Plaintiff testified her conditions had become worse since the 2011 hearing. *Id.* ALJ Lawritson asked Plaintiff how many "bad days" she was experiencing in 2011. AR 552. Plaintiff testified "three days" per week. *Id.*

Finally, Plaintiff testified her therapist, Joan Fitzgerald, told Plaintiff she thought Plaintiff could "get a job," but she did not think Plaintiff could "do a good job" because her "mind is so scattered." AR 553. Plaintiff asserted her goal was to "get better" so she could return to work, and she had discussed "voc rehab," but she and her therapist were "more concerned about treatment right now." *Id.*

ALJ Lawritson proceeded to examine the VE, Mr. Rauer, who testified at Plaintiff's previous hearing in 2011. AR 554. ALJ Lawritson proposed a hypothetical to the VE describing a person

> of the same age and education as claimant, with that work history, [who] is able to perform work at the sedentary level. The person could only occasionally stoop, crouch, climb stairs; but could never climb scaffolds, ladders, or ropes; could never balance, crawl, or kneel. The person could sit 45 minutes at a time; could do no pushing or pulling with the feet; could not be exposed to hazards in the work place; could understand, remember, and carry out simple instructions; could tolerate only occasional interactions with coworkers and the public.

AR 555. ALJ Lawritson asked the VE if his testimony would be identical to his testimony in 2011, since the hypothetical posed to him by ALJ Lawritson was "similar, if not the same, as that

given by Judge Wendland at the last hearing, although phrased a little differently." *Id.* The VE testified in 2011 that the hypothetical person was capable of performing work as a surveillance system monitor, a hand painter and stainer, and an escort driver. AR 556. The VE testified he would remove escort driver due to the person's inability to push or pull with her feet. AR 557. However, the VE replaced the position with scale attendant, and stated the prescribed limitations would erode the availability of the positions by twenty-five percent. AR 558.

> ALJ Lawritson then proposed an additional hypothetical:

> [An] individual could occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds. The person could stand and walk about two hours during an eight-hour workday; sit about six hours during an eight-hour workday. The person would need to avoid concentrated exposure to extreme cold and heat, as well as vibrations. And this person can understand, remember, and carry out only simple instructions and tolerate only occasional interaction with coworkers and the public.

AR 559. The ALJ asked whether the three occupations described previously would "survive" the hypothetical. *Id.* The VE testified the surveillance system monitor and hand painter/stainer would, but the scale attendant would be eroded by an additional twenty-five percent, which he felt was eroded to the point where he would withdraw it from consideration. However, he would reinstitute escort driver due to the removed limitation on pushing and pulling with her feet. *Id.* ALJ Lawritson then asked if there were any positions that allowed the individual to lie on the floor during the work day. AR 561. The VE testified the surveillance system monitor position was available with an erosion of fifty percent. *Id.*

> Plaintiff's counsel then examined the VE. AR 562. Counsel told the VE to rely on ALJ Lawritson's first hypothetical and asked if the positions would survive if the person had to walk

away from his or her workstation and not simply stand at the workstation during breaks. AR 563. The VE testified none of the positions would allow the person to walk away from the work station for ten minutes every forty-five minutes. AR 564. Plaintiff's counsel changed the hypothetical to a person able to sit for only twenty minutes and stand at the workstation for ten minutes. AR 564. The VE testified that the job of surveillance monitor, hand painter/stainer, and scale attendant would not be eliminated. AR 565. Counsel then added that the individual would need additional scheduled ten-minute breaks throughout the day. AR 566. The VE testified that only the hand painter/stainer would survive. *Id.* Finally, Plaintiff's counsel added a limitation that the individual had "noticeable" panic attacks three times per month. *Id.* The VE admitted they were "far afield from anything the DOT would address" but, in his experience, such individual would be terminated. AR 567.

ALJ Lawritson issued a decision on August 27, 2014, finding Plaintiff was not disabled. AR 678-697. Plaintiff requested review from the AC, which was granted. AR 706-707. The AC remanded the case back to an ALJ with directions to consolidate the claim and the subsequent application to create a complete and final exhibit list, give further consideration to the non-treating source opinion and explain the weight given to such evidence, and issue a new decision. AR 708-710. On remand, the case was again before ALJ Lawritson, who conducted another hearing on June 14, 2016. AR 569-598.

June 14, 2016 Hearing

At the hearing on June 14, 2016, Plaintiff appeared with counsel, and she and a VE, William Tisdale, testified. AR 569. ALJ Lawritson began by asking whether Plaintiff's counsel

had reviewed the Cooperative Disability Investigation ("CDI") report. AR 573. Plaintiff's counsel responded that he had not and asked to receive a copy and comment on the findings after the hearing. AR 574.

ALJ Lawritson proceeded with examination of Plaintiff. *Id.* Plaintiff testified her condition had become worse, she was struggling with "more anxiety, panic, stress," and she still had a sleeping disorder. AR 575. She claimed her issues were more frequent and intense. *Id.* Plaintiff again testified to "blowing up." *Id.* In response to her counsel's questions, Plaintiff explained that she "[blew] up" when "somebody yell[ed]" at her and she "gets angry" and "starts yelling." AR 577. Plaintiff also testified that an individual who accompanied her to the hearing was her friend, John, who she had known for twenty-seven years. AR 578. *Id.* She said he helped her "get on the bus, shop, stuff like that," and "it is easier with John." *Id.* Plaintiff then stated that her panic attacks had become worse, and she had them "at least five, six times a month." AR 579. She explained that when she had a panic attack it took her until the next day to recover. AR 580.

Plaintiff also testified her blood sugar was "a little high" because she had been homeless for about two and a half months. AR 580-581. Plaintiff added that she was still having problems with her depression, saying she felt "hopelessness and worthlessness," but she would "never hurt [her]self because of [her] Christian belief." AR 581. She further testified that when she had a place to stay, she would sleep for "three days straight." AR 582. With respect to her back, Plaintiff stated the pain had increased as well. *Id.* She pointed to where her back hurt at her shoulder blade and at her lower back including her hip area with pain that shot down her leg to her

foot and toes.  AR 583-585.

Plaintiff then testified she was only able to leave her apartment "five or six times a month" and only for appointments or to "go with John to the grocery store."  AR 586-587.  She said she had been prescribed an emergency anxiety medication but was unable to recall the name.  AR 588.  ALJ Lawritson asked Plaintiff whether she was still visiting Community Reach.  AR 589.  Plaintiff responded that she was, and her last visit was "[a] week ago."  AR 590-591.  Plaintiff testified she was trying to "switch right now" to Salud or Kaiser because she had "an episode" with a supervisor.  *Id.*

ALJ Lawritson proceeded to examine the VE, Mr. Tisdale.  AR 593.  The ALJ described a hypothetical individual with

> sedentary exertional level … could stand and walk two hours during an eight-hour workday; sit six hours during an eight-hour workday, could never climb ladders, ropes or scaffolds, but otherwise could occasionally climb, stoop, kneel, crouch, and crawl … avoid concentrated exposer to extreme cold and heat as well as vibrations … is able to understand, remember, and carry out simple instructions, but is able to tolerate occasional interaction with supervisors, coworkers, and the public.

AR 593.  ALJ Lawritson then asked if the individual could perform work of surveillance system monitor, hand painter and stainer, or escort vehicle driver.  AR 594.  The VE testified that the individual with the prescribed limitations would be able to perform the identified work.  *Id.*

Plaintiff's counsel asked the VE, if the individual "acted inappropriately" with a supervisor one-third of the time, would the individual be able to perform competitive work?  AR 595.  The VE responded, "that individual would not be able to sustain employment."  *Id.*  Plaintiff's counsel then reduced the frequency of the inappropriate behavior to twice a month.  AR

596.  The VE testified the individual would be "given perhaps one to two warnings, and after that would be terminated from employment."  *Id.*

ALJ Lawritson issued a decision on November 1, 2016, finding the Plaintiff was not disabled.  AR 479-508.

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(i), 423, 1382.

## I.      SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that his

impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *Id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education, and work experience. *See* 20 C.F.R. § 404.1520(g).

## II.     Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## **ALJ's RULING**

In his most recent decision, ALJ Lawritson ruled that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability, October 23, 2008 (Step One). AR 482. Further, ALJ Lawritson determined that Plaintiff had the following severe impairments: obesity, diabetes mellitus, hypertension, a disorder of the lumbar spine with sciatica, major depressive disorder, posttraumatic stress disorder, and a panic disorder (Step Two). AR 485. He found Plaintiff's sleep apnea was not a "severe" medically determinable impairment, despite a prescription for a CPAP machine, because Plaintiff testified in 2014 that "her sleep had improved," the medical records only contained a "few complaints of fatigue," and she had "denied fatigue on several occasions." *Id.* Next, ALJ Lawritson found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). AR 486. The

ALJ then formulated the following RFC, finding the Plaintiff could perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is able to stand and/or walk two hours during an eight-hour workday. The claimant is able to sit for six hours during an eight-hour workday. The claimant must never climb ladders, ropes or scaffolds, but she is otherwise capable to occasionally climb, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposer to extreme cold and heat as well as vibration. The claimant is able to understand, remember, and carry out simple instructions. The claimant is able to tolerate only occasional interaction with supervisors, coworkers, and the public.

AR 489. In considering the entire case record, ALJ Lawritson found that the Plaintiff's "combination of symptoms and limitations associated with claimant's severe and non severe impairments would cause functional limitations"; but the "treatment notes, medical opinions, subjective complaints, the infrequent nature of the claimant's medical treatment, and the record as a whole show that the claimant's impairments do not reach a debilitating level." AR 506.

The ALJ found that, considering her RFC, Plaintiff was not able to perform any past relevant work (Step Four). *Id.* As a result, ALJ Lawritson, relying on the VE's testimony, found that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the nation economy. A finding of 'not disabled' is therefore appropriate." AR 508. Therefore, Plaintiff was not disabled at Step Five of the sequential process and not disabled as defined by the SSA. *Id.*

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the findings of the ALJ regarding the relative weight to be afforded the opinion evidence are not supported by substantial evidence and

do not comply with the directions set forth in the regulations; (2) the ALJ failed to comply with the regulations and the social security rulings when he failed to consider adequately Plaintiff's non-exertional limitations in his RFC findings, and/or failed to explain adequately his failure to do so; (3) the ALJ erred by failing to make adequate findings at Step Four regarding the functional effects of Plaintiff's subjective symptoms, including pain, and by assigning physical RFC restrictions related only to her objective symptoms; and (4) the ALJ erred by failing to hold the Commissioner to her burden of proof at Step Five and by failing to determine whether there was any discrepancy between the information listed in the Dictionary of Occupational Titles and the VE's testimony, and if and/or how that discrepancy was resolved.  Opening Br., ECF 18 at 1.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

### I. ALJ Lawritson Properly Weighed the Opinion Evidence and His Findings Were Supported by Substantial Evidence

Plaintiff argues that ALJ Lawritson committed reversible error when he afforded more weight to Dr. Chambers' opinion than to the opinion of Dr. Finch. This is Plaintiff's second attempt to persuade the Court that an ALJ erred in affording more weight to Dr. Chambers' opinion than to Dr. Finch's opinion. In the prior case before Judge Jackson, Plaintiff argued "[w]hile affording Dr. Finch's opinion on [Plaintiff's] functional limitation 'considerable weight,' the ALJ did not discuss [Dr. Chambers'] opinion that [Plaintiff] could sit for less than six hours." AR 1186.  This is the same argument Plaintiff attempts to proffer here. There has been no additional testimony or medical records, nor additional medical opinions from either Dr. Finch or

Dr. Chambers. The record as it pertains to Dr. Finch and Dr. Chambers is identical to the record reviewed by Judge Jackson in 2014.

Defendant argues that because Judge Jackson previously held there was no error in the ALJ's weighing of the doctor's opinions, the judge's prior decision demonstrates that a reasonable mind can agree with the ALJ; thus, the ALJ's decision is supported by substantial evidence. Response Br., ECF 19 at 13. This Court is not persuaded by an argument that Judge Jackson's prior ruling can be used as the sole support for a finding of substantial evidence. When analyzing whether substantial evidence exists, the Court must "meticulously examine the record as a whole." *Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005). "Decisions based on the culling of isolated bits of evidence from the record to support a preconceived conclusion will not satisfy the substantial evidence test." *Himmelreich v. Barnhart*, 299 F. Supp. 2d 1164, 1167 (D. Colo. 2004). It would be improper to rely on Judge Jackson's Order as the sole evidence supporting the substantial evidence standard.

However, the Court understands Defendant as asserting the "law of the case" doctrine and agrees on the effect Judge Jackson's Order has on this issue. Although primarily applicable between courts of different levels, the doctrine of law of the case applies to judicial review of administrative decisions. *Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1201 (10th Cir. 2007) (quoting *Gringsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002)). Furthermore, the Tenth Circuit held

> The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. The doctrine has particular relevance following a remand order issued by an appellate court. When a case is appealed and remanded, the decision

of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand *and the appellate court in any subsequent appeal*. The law of the case doctrine is intended to prevent continued re-argument of issues already decided, and to preserve scarce court resources-to avoid in short, Dickens's *Jarndyce v. Jarndyce* syndrome.

*Id.* (quoting *Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128, 1132 (10th Cir. 2001)) (emphasis added).

This case is before the Court on a subsequent appeal and is subject to the law of the case doctrine. As Defendant correctly argues, Judge Jackson decided this issue in his 2014 Order. Judge Jackson stated that "[t]he ALJ committed no legal errors when he decided, in light of the entire record, that [Plaintiff] was slightly less restricted than Dr. Finch suggested." AR 643. Judge Jackson qualified that statement, holding, "For example, Dr. Chambers offered a slightly less restrictive assessment that indicated [Plaintiff] could sit for about six hours." *Id.* The holding was derived from the same record before this Court today and is unambiguous. Thus, the Court will not address an issue that has been already decided, especially when the ruling was made considering the record as a whole, and there has been no new evidence on the issue. Pursuant to the law of the case doctrine I will do nothing to disrupt Judge Jackson's prior ruling.

## II. ALJ Lawritson Properly Considered Plaintiff's Non-Exertional Limitations and Adequately Explained His Reason for Discounting Plaintiff's Subjective Complaints

Plaintiff argues ALJ Lawritson committed reversible error by failing to properly consider Plaintiff's non-exertional limitations when formulating Plaintiff's RFC. Opening Br., ECF 18 at 24. Plaintiff claims her mental, non-exertional conditions limit her "ability *to do* a competitive job," and ALJ Lawritson's RFC failed to adequately represent her limitations. *Id.* at 25 (emphasis in original). The Court is not persuaded by Plaintiff's argument.

An ALJ's omission of an impairment altogether could be reversible error. "It is beyond dispute that an ALJ is required to consider all of the claimants medically determinable impairments, singly and in combination; the statute and regulations require nothing less ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

ALJ Lawritson's analysis was extraordinarily thorough, and he addressed and considered every exhibit in the record when formulating Plaintiff's RFC. AR 495-506. ALJ Lawritson proceeded to explain the weight given to every non-exertional medical opinion and the reason for the weight. AR 502-506. Plaintiff claims ALJ Lawritson erred by not including sufficient limitations to account for Plaintiff "blowing up" at supervisors or having "five or six panic attacks a month" into Plaintiff's RFC. However, ALJ Lawritson discussed in detail all of Plaintiff's claimed limitations and his reasons for discrediting some of Plaintiff's claims.

As Defendant notes, the only source of Plaintiff's claims to having specific limitations was Plaintiff's own subjective reports or testimony. Every exhibit cited by Plaintiff contains her subjective complaints. Plaintiff's claim of panic attacks "five or six times a month" cites to a CRC intake form that stated, "[Plaintiff] reports that panic attacks get triggered by stress and worry. Has then [sic] 1-3 times/month." AR 1533. Plaintiff claims that she went to the Emergency Room ("ER") and cites solely to a CRC initial diagnostic interview that states "[t]he

patient has had no psychiatric hospitalizations but went to the ER once for a panic attack. No suicide attempts, homicidal ideation, or violence." AR 1551. This is the only indication of any ER visit, and there is no record of the visit or any medical reports associated with such visit anywhere else in the record. Finally, Plaintiff cites to her own testimony at the 2016 hearing as evidence of Plaintiff "blowing up" at supervisors. AR 596. Plaintiff does not cite to any objective medical evidence for any of her claimed non-exertional limitations.

The Court is required to give particular deference to the ALJ on this issue. Response Br., ECF 19 at 13-14; *see also White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). With that in mind and after review of the record, the Court finds that Plaintiff fails to demonstrate any error, and that ALJ Lawritson, in forming the RFC, properly addressed all of Plaintiff's impairments and explained his reasoning in discrediting some of her limitations.

## III. ALJ Lawritson Properly Addressed Plaintiff's Subjective Symptoms in Forming Plaintiff's RFC

Plaintiff argues that ALJ Lawritson committed reversible error at Step Four when he improperly included only Plaintiff's objective symptoms in her RFC. Opening Br., ECF 18 at 26. She claims ALJ Lawritson failed to address all of the factors set forth in 20 §§ C.F.R. 404.1529(c) and 414.529(c)(3). *Id.* at 27.

In other words, Plaintiff contends ALJ Lawritson failed to include subjective symptoms specifically associated with Plaintiff's back pain. Again, this is Plaintiff's second attempt at making this argument. In his Order, Judge Jackson addressed Plaintiff's argument that the ALJ improperly discredited Plaintiff's subjective pain symptoms. AR 637. That is, after addressing Plaintiff's claim that the ALJ improperly evaluated Plaintiff's credibility, Judge Jackson held:

Rather [the ALJ] looked at the record as a whole, credited the fact that she has back problems that are severe, credited the fact that those severe problems caused pain and some limitation, and ultimately, in light of some contradictions in the evidence, decided not to credit her testimony that the symptoms made her unable to work. These are valid reasons for an ALJ to discount a claimant's testimony. 20 C.F.R. § 404.1529(c).

*Id.*

The record in 2014, as it pertains to Plaintiff's back pain, is identical to the record before this Court today, with the exception of six additional visits. However, these additional medical records do nothing to conclude any differently than Judge Jackson did in his Order.

First, the records reflect that Plaintiff complained of back pain to MCPN for the first time during her appointment on June 21, 2011. AR 1389. Plaintiff did not return to MCPN, and there are no other records of reported back pain, until June 2, 2012. AR 1385. At Plaintiff's next visit to MCPN on January 8, 2013, she reported her back pain was rated a ten out of ten. AR 1374. However, the exam during the visit showed no deformity, no tenderness, no sciatic notch tenderness, normal toe and heel walking, normal squatting, and forward flexion of ninety degrees. AR 1376. Plaintiff was directed to continue to take aspirin and Cyclobenzaprine and, additionally, she was prescribed Meloxicam. AR 1377. Also, Plaintiff was given stretching exercises and directed to use a heating pad. *Id.* After this January 2013 visit, the record is devoid of any documents reflecting an examination or discussion of Plaintiff's back pain.

Plaintiff asserts that two visits on June 5, 2013 and August 28, 2013 show "ongoing treatment with exercise and multiple medications for shoulder, back and neck pain." AR 1591-1605. However, the visits exclusively discuss Plaintiff's *neck* and *shoulder* pain. *Id.* Plaintiff's back pain is simply included in the section titled, "list of current problems," and the medication

for Plaintiff's back pain is included in the section titled, "[p]rescriptions." *Id.* Even if the Court were to accept these two visits as evidence of continuing medical records for back pain, Plaintiff agrees these records "contain the most recent physical treatment notes in the record." Opening Br., ECF 18 at 28 (emphasis omitted). There are no additional records of any treatment for Plaintiff's back pain after 2013, despite Plaintiff's submission of records as current as 2015. The additional evidence does nothing to contradict Judge Jackson's reasoning, and I will not do anything to disrupt the prior ruling.[2]

### IIII. ALJ Lawritson Adequately Held the Commissioner to Her Burden of Proof at Step Five, and any Failure to Determine Whether There Was any Discrepancy Between the Dictionary of Occupational Titles ("DOT") and the VE's Testimony Was Harmless

Finally, Plaintiff claims ALJ Lawritson committed reversible error at Step Five by failing to hold the Commissioner to her burden of eliciting testimony about any discrepancies between the DOT and the VE's testimony. Opening Br., ECF 18 at 29. Plaintiff argues, "[n]owhere [sic] during the June 14, 2016, hearing did the ALJ ask the VE whether his testimony was consistent with the DOT, or, if it was not, how the VE's answer was derived." *Id.* The Court is not persuaded that an error occurred.

Defendant argues the hypothetical RFC proposed to the VE during the 2014 hearing was identical to the hypothetical RFC proposed to the VE during the 2016 hearing. Response Br., ECF 19 at 19. Furthermore, Defendant contends this is "relevant" because "[a]lthough the ALJ did not ask the [VE] whether his testimony was consistent with the DOT at the 2016 hearing, he

---

[2] Defendant cites to evidence found in the CDI report in support of their argument in this section. ALJ Lawritson excluded the evidence in the CDI and the Court disregards the evidence as well.

did ask that question at the 2014 hearing." *Id.*

The hypothetical RFC proposed in 2014 restricted the individual to "occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds." AR 559. In 2016, the hypothetical RFC restricted the individual to a "sedentary exertional level."[3] AR 593. Both hypotheticals included the ability to stand and walk for approximately two hours during an eight-hour workday; sit six hours out of an eight-hour workday; avoid concentrated exposure to extreme could, heat, and vibrations; understand, remember, and carry out only simple instructions; and tolerate only occasional interaction with coworkers and the public. AR 559, 593. However, the hypothetical RFC proposed in 2016 additionally included "supervisors" in the group with whom the individual was limited in interacting; a complete restriction on climbing ladders, ropes, or scaffolds; and, the ability to occasionally climb, stoop, knee, crouch and crawl. AR 593. Although the RFCs are not "identical," they include many of the same restrictions, and both VEs testified the individual was capable of working as a surveillance system monitor, a hand painter and stainer, and an escort vehicle driver. AR 559, 594. When the VE in the 2014 hearing was asked if his testimony differed from the DOT he responded, "I don't differ from the DOT, but the DOT doesn't cover some of the issues of the hypothetical." AR 560. The VE then identified the limitations the DOT did not cover, and the VE testified he "relied upon [his] experience as a voc[ational] rehab[ilitation] counselor for over 30 years." *Id.*

_____

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567.

Plaintiff has failed to identify any error beyond ALJ Lawritson's mere failure to ask the VE a specific question. Plaintiff has failed to direct the Court to any evidence or case law that demonstrates the VE's testimony was in conflict with the DOT. The burden of showing that an error is harmful normally falls on the party attacking the agency's determination. *Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009). Furthermore, the Tenth Circuit has held a plaintiff must argue that the VE's testimony conflicts with the DOT, not merely that the ALJ did not ask the question. *Williams v. Colvin*, 524 F. App'x. 414, 418 (10th Cir. 2013) (because [the plaintiff] does not contend that the VE's testimony conflicts with the DOT, any failure by the ALJ to ask the VE if her testimony was consistent with the DOT was harmless).

To the extent that the ALJ's omission might be construed as "harmless error," the Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer–Ross v. Barnhart,* 431 F.3d 729, 733 (10th Cir. 2005). The Court understands the need to be cautious and appreciates that if harmless error analysis is "too liberally embraced, it could obscure the important institutional boundary ... [that] courts avoid usurping the administrative tribunals responsibility to find the facts [and the] risks violating [of] the general rule against post hoc justification of administrative action." *Id.* (citing *SEC v. Chenery Corp.,* 318 U.S. 80 (1943)). Neither of these concerns apply in this case.

Common sense, not technical perfection, is the ALJ's guide. *Bowen v. Yuckert*, 482 U.S. 137, 157 (1987) (O'Connor, J., concurring) ("To be sure the Secretary faces an administrative task of staggering proportions in applying the disability benefits provision of the Social Security Act. Perfection in processing millions of such claims annually is impossible."). The record contains

prior testimony from another VE, discussing an almost identical hypothetical RFC and stating his testimony did not differ from the DOT, and where it did, he relied on thirty years of experience. AR 560. The record as a whole shows ALJ Lawritson held the Commissioner to her burden. Therefore, the Court holds ALJ Lawritson did not commit reversible error.

## **CONCLUSION**

In sum, the Court concludes that the ALJ properly (1) afforded more weight to Dr. Chamber's opinion over that of Dr. Finch, (2) explained why he discounted and excluded Plaintiff's non-exertional limitations in his RFC, (3) explained why he discounted Plaintiff's subjective symptoms of back pain, and (4) properly held the Commissioner to her burden. Therefore, the decision of the ALJ that Plaintiff was not disabled since October 23, 2008 is AFFIRMED.

Dated at Denver, Colorado this 2nd day of August, 2019.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge